Case 13-1163, USA v. Sherrod Davis, Oral Argument, not to exceed 15 minutes per side. Ms. Hayes for the appellant. May it please the Court, Stephanie Hayes for the United States.  The United States respectfully asks this Court to reverse the District Court's decision. I'd like to start with the District Court's legal analysis, which is what we appeal, and then address the point of seizure arguments raised by Davis. Here, the District Court did not use the right approach for totality of the circumstances because it isolated and disregarded the facts that led to Mr. Davis' stop. Five facts were dismissed because the Court accepted Davis' innocent explanations. One, possibly two, because of clear factual error. And the strongest fact, that two officers saw the outline of a gun in Davis' bulging pocket, was ignored. The late hour and the high crime setting were rejected and dismissed. I want to go back to the sighting of the outline of a weapon in the pocket. Was that done before, or did the sighting occur before or after the officers basically had the suspect pinned between the wall and their vehicle? They saw the outline of the gun when their vehicle was alongside Mr. Davis. I recall the testimony was that they were alongside him with the windows down, and that gave them the vantage point. But they were alongside him after they pulled in and basically had him between the wall and their car in a very close confinement, correct? I would respectfully disagree with calling it pinned in, because what Mr. Davis was doing as they pulled their car alongside him was he was now walking forward alongside the wall of the gas station towards the door. He had complete freedom of movement to continue walking forward, which he did do, or to stop, turn around, and go back. But they were close by, yes. The high crime setting was dismissed because the court said that Officer Alam could not identify an area of Detroit that was not high crime. But what the record shows is that Officer Alam identified several areas of Detroit that were high crime areas. At least two officers testified that they were back at that scene in order to respond to a shooting, and Mr. Davis himself testified that he had been quote, robbed at this same gas station. So that would be just a clear factual error in the opinion. Mr. Davis' nervous and scared look and his walk away were not considered as part of the totality of the circumstances. And here, Mr. Davis never disputed that either of those two things happened. What he did was he gave his reasons for why they happened. And yet the order says that the court was not convinced that the defendant looked nervous or walked away from the officers. Assuming you're right about the approach that the district court took, what criminal activity did the officers have reasonable suspicion about? They had reasonable suspicion that he was carrying a concealed weapon. Well, is that a violation of the law in all instances? In all instances, no. What specific criminal activity? I don't think your brief tells us what law he was alleged to have violated. There's alleged to have been reasonable suspicion about. It would have been MCL 750.277, which is the Carrying Concealed Weapons Statute. It makes it unlawful to carry a concealed weapon without a license or a permit. They didn't have any information about whether he had a license or a permit, did they? No, they didn't, Your Honor. They didn't have any information about whether he was a felon or anything else that might have prohibited him from carrying a weapon. That's correct, Your Honor. But in Michigan, the incriminating nature of a person carrying a concealed weapon is immediately apparent, even if the carrier is later determined to be licensed to carry. What do you mean that the incriminating status is immediately or readily available? What does that mean? It's a direct quote from United States v. Galavis. What does it mean? What it means, Your Honor, is that MCL 776.20 puts the burden on a defendant or a suspect to establish that he has a license or exception to the prohibition on carrying a concealed weapon. Without any reasonable suspicion or anything, are you saying that under that statute, officers can simply go up and immediately frisk an individual or question or anything of that nature? No. Because we get back to what Judge Gibbons was inquiring about, first of all. And the question was, what was he suspected of having done? Because the officers had no information about any license that he might have or might not have had or any other crime he may or may not have been committed or what was in his pocket, really. So what was it that enabled them to make the approach and to do all the other things that occurred subsequent? So what enabled them to do the approach was the eight factors that I've outlined in my brief that indicated to them that he was carrying a concealed weapon. The most sort of dramatic factor being the outline of the distinctive L shape. And it's a crime to carry a concealed weapon in Michigan. And there is an exception. Correct. So didn't they have to have some basis to think that he didn't have a license or that he was a felon or something? Doesn't that have to be part of reasonable suspicion? Respectfully, no, it doesn't. Because in Michigan, and again, I'm referring to a case that's not cited in the briefs because it wasn't briefed, it wasn't raised, it wasn't even an issue in the district court. But this court's holding in Galaviz, G-A-L-A-V-I-Z, 645 F 3rd, 347. This is from 2011. And that's where I'm getting the language of incriminating nature, Judge Donald. It is immediately apparent under these two statutes. But if we accept your position and your interpretation of that case, wouldn't that basically constitute, I guess, an abrogation of basic Fourth Amendment law? You said the statute says you can't do this and so the police can just go up and do this kind of search. That seems problematic. You're interpreting the statute basically to authorize the officers to approach him, arguably to seize him, even if they don't have any way of knowing and there's nothing in his conduct to suggest that he's in violation of the law, other than he arguably has a gun. I'm not arguing that. Okay, well try again. Okay, I will. So I think what's helpful is that a panel of this court interpreted Galaviz in the reasonable suspicion context. And maybe that decision would be helpful. There, a panel of this court decided that based on that precedent and these laws, even less than what we have here, an informant's tip that a suspect was carrying a concealed weapon in his car, and the statute covers both carrying a concealed on your person and in a car, I should say, that that amounted to an allegation of illegal conduct. So that is alleging illegal conduct if an informant says he's carrying a concealed weapon. No, we had better evidence here. There was nothing else in that case, in Galaviz, other than the informant's tip. I mean, there was no other indication that what the defendant or the person ultimately seized was doing was illegal. No, I'm sorry, Your Honor. Galaviz just stands for the proposition, helps us interpret the MCLs, that it is incriminating to carry a concealed weapon without showing a permit and the burden is on the defendant. Well, that would permit them to ask him if he was, you know, to say it looks like you've got a gun or you're licensed to carry it, maybe. I mean, that might enable the questioning, you know, if they were authorized to stop him in the first place, but that's not what happened here. Correct, Judge Gibbons, that's not what happened here. And I want to make clear to Judge Donald as well that I'm not arguing that on the basis of these MCL laws that an officer can go and start patting down a man because they think he has a weapon, but here we have a lot of evidence that he was not only carrying a weapon, but carrying one illegally. That's because of his nervous and scared look. It's because of his immediate walk away. It's because of that repeated check on the bulge, which the officers testified, based on their training and experience, was a almost like an unconscious check on contraband or weapons and that they had seen it before. They had both been trained on it and they had seen it before in their experience. They also saw the weight and swing of the bulge as he walked away and it had the weight and swing of a weapon. And again, based on their experience. And then finally, when they pulled their car alongside and they asked him, could you take your hand out of your pocket, and he did briefly before putting it back in, that's when they saw the unmistakable, I think was the language they used, L-shape of a weapon. So we had a lot of reasonable suspicion, a lot of things that made their suspicion of him carrying a weapon reasonable. And because he may have had an innocent explanation and really the idea that he may have potentially been carrying a permit is yet another example of having an innocent explanation for carrying the concealed weapon. But that doesn't defeat reasonable suspicion, particularly if we recall the burden of proof is considerably less than proof of wrongdoing by preponderance of the evidence. You know, I am listening to this and reading the record about this unmistakable weight. And I guess right now in an era of just increased technological devices, people with cell phones and other things are going to create huge budgets. And there are, you know, I'm not inserting evidence in the record, but guns that don't look like L-shapes. And I guess I'm troubled by this articulation of these facts that are proper to constitute the reasonable suspicion. I'm just troubled by that. And, you know, the weight and swing and check and all of that. It starts to sound like a justification post-stop and seizure as opposed to things that gave rise to some kind of reasonable suspicion. That's just where I am right now. I just have to say that. I guess what I would add to maybe allay, I'm hoping to allay your concern, is that at the very end of the process before the stop occurred was that one officer did get out and actually before touching him or laying hands on him asked, what do you have in your pocket? And Mr. Davis' response was, shit. And the testimony was that that response was said in a tone like, I'm caught. Now, the district court didn't make a credibility finding on that and Mr. Davis didn't deny saying that. He just gave an alternative explanation for it which was, oh, that didn't mean I was caught, it meant I didn't have anything. And this is the same legal error, is that it was dismissed again in isolation, not considered as part of the totality of the circumstances because an innocent explanation was given. And I see my time's up. Thank you. Let me ask a question before you sit down. There is no debate about the fact that the police were allowed to approach him and were allowed to say, what do you have in your pocket? That's perfectly valid, is it not? That's correct, Judge Tucker. Good morning, your honors. May it please the court. My name is Lauren Kogali. I represent the defendant in this case, or the appellate. Excuse me, in this case, Mr. Sherrod Davis. I'm not used to being in the seat of the appellee. The government in this case largely focuses on the legal analysis of the district court, claiming that the court engaged in an impermissible divide-and-conquer analysis. And I offer to this court that that's just simply not true, that the district court considered the totality and was in a unique position to consider the totality of the evidence before it. The district court observed all three officers, as well as the defendant testifying in this case, and engaged in some questioning of the officers and the defendant herself. She made credibility determinations, some which I think were explicit in her opinion, and some which I think were implicit. And ultimately, she concluded that, taken as a whole, that the officers' testimony was unconvincing. And the court reached this conclusion with good reason. Some of those reasons this court has already drawn attention to. Only one officer claims to have seen the nervous look to which the government references. And two officers remember either Mr. Davis looking down or don't recall his expression at all. The officer who did say that he saw Mr. Davis have a nervous look on his face acknowledged during testimony that that did not factor at all into his decision to go and investigate Mr. Davis. Of course, there's nothing remarkable about that, though, that officers' attentions might have been drawn to different things or that everybody might not have seen the same thing at the same time. Nothing unusual about that, is there? I don't think it's particularly unusual, but I do think to the extent that the court heard one officer testify that he saw Mr. Davis look nervous for a period of five to ten seconds, which, quite frankly, is a long time before he saw Mr. Davis walk away, while two other officers said that Mr. Davis was either looking down or had an expression that did not register as nervous on his face and immediately walked away, I do think that there is a discrepancy between that testimony and that the court made a determination about how heavy to weigh that evidence. I also think that it is important that the officer who claimed that he saw Mr. Davis look nervous also said that that did not factor into his decision to approach Mr. Davis. It's also relevant that none of the officers recalled what Mr. Davis was wearing outside of being able to basically acknowledge that he had a coat on, and that's particularly relevant because Mr. Davis testified that the firearm that was found was not actually in his right coat pocket, as the officers claimed, but inside of his jacket pocket. Also testimony that ultimately the district court gave some credit to. It sounded to me, counsel, like he had on a hoodie, and I would assume a hoodie might be made out of sweatshirt material, and that the outline of a gun might be visible, but you're telling me that on top of that he had a coat? Yes, Your Honor. The discrepancy between the defendant's testimony and the officer's testimony was this. The officers alleged that they found a firearm in Mr. Davis' right coat pocket. Mr. Davis testified, in fact, that he had a pop bottle in his right coat pocket that the firearm was actually inside of a hoodie, as Your Honor described it, inside the pocket of a hoodie, which was then tucked into the waistband of his jeans. Which I should offer, to that extent, would create the bulge that some of the officers saw in terms of the pop bottle, but would negate the officers' testimony that they necessarily saw a gun-shaped object swinging. The court reasonably evaluated all of this testimony, and it found that it was unlikely that the defendant looked nervous, or that he was walking away from the officers. The government also argues that the court didn't give enough weight to the officers' training in analyzing the totality of the circumstances. But I do think it's important to acknowledge that the fact that an officer says, I have training in, are not magic words that absolve officers of engaging in any assessment of the situation. Here, Mr. Davis was doing nothing momentous. He was standing outside of an open establishment. It was late at night, it was around midnight, but the business that he was at was open. The officers testified that it was well lit. In fact, one officer testified that it was daylight light. And the government argues that the judge just discredits the fact that it's a high-crime area, because the officers testified that it was well lit. I offer that the judge didn't say that it wasn't high-crime at all. In fact, she acknowledged that the officers testified it was a high-crime area, but just like we assume that we put lights places to make them safer, we put lights in parking lots, it's reasonable for the court to say that the fact that it was a high-crime area and that it was nighttime is mitigated somewhat by the fact that the area is very well lit and Mr. Davis is standing out in the open. He's not hiding, it's not dark, he's not in the shadows. Was it the judge who also said that all of Detroit is a high-crime area? I believe that at some point in the record the judge did acknowledge that the majority of Detroit would be considered a high-crime area, I think relative to perhaps other cities. There were areas in which the officers said that they would consider less high-crime than others. Some of the officers testified it was high-crime, a couple of the officers testified that it was an area that was relatively high-crime, not the worst they've worked in. I think that it's important in terms of looking at the court's legal analysis here to consider that the judge was in a unique position to listen to all of the officers' testimony, that she heard them talk about their training and that she heard them talk about everything they saw, and she also heard Mr. Davis' version of what occurred that night. She considered all those factors and she weighed them against each other and determined that some carried more weight than others. The government is suggesting that somehow the court is supposed to evaluate the totality of the circumstances without weighing the individual factors. And quite frankly, that's an impossibility. Here, I'd like to talk a little bit about the actual stop and the point of seizure in what Mr. Davis was doing. I'd sort of like to break that, get away from what the district court said, and kind of break that down. Officers here, your position, okay? I want to make sure I've got everybody's position. Was the first encounter with the officers a consensual encounter or a Terry stop, in your opinion? In my opinion, this was never a consensual encounter. These officers did not attempt to engage Mr. Davis in any sort of casual conversation. The first words they said to him are, whether it was a question or... In your analytical framework, it's a Terry stop from the get-go. Yes, Your Honor, and I would say that the officers testified, in fact, that the reason that they pulled into the get... Or the reason that they were approaching him was to investigate him. I don't think this could be construed as a consensual encounter. The officers testified that they pulled up so close to Mr. Davis that had they opened the door, they were close enough that they could have actually hit him with the door. Logistically, the government's argument that Mr. Davis was walking away... In fact, he was walking with the officers traveling alongside him. He never picked up his pace. The officers all testified consistently that Mr. Davis was walking at a normal pace, and he was walking toward the door of the open gas station. And you make an argument that the actual moment of seizure occurred prior to the time that the officer grabbed Mr. Davis by the arm. Yes, Your Honor. It's our position that at the point that the officers pulled up so close to Mr. Davis that he really... I suppose he could have gone backward or forward, but the officers are so close to him that they're saying they could hit him with the door, that they could reach out and grab him. They're not engaging him in casual conversation. The first thing they say to him is, please take your hands out of your pocket. That's not a consensual encounter, and Mr. Davis was not free to leave at that point. I'm sorry. Yes, Your Honor. Assuming it's not a consensual encounter, it might be a teary stop at that point. Certainly they had pulled up to investigate him. It's our position that they had no basis at that point to be engaging in a teary stop. There was nothing to establish reasonable suspicion. There was no indication of criminal activity. Unlike the cases cited by the government in their brief, there was no 911 call, there was no dispatch. Mr. Davis did not flee when he saw them. He was literally standing outside of an open establishment at night doing nothing. Do you argue that... Well, first of all, if the court determines that the point of seizure didn't occur until after the officers grabbed him by the arm, is it still your position that they lacked reasonable suspicion to approach or question him under prevailing jurisprudence? Well, Your Honor, to the extent that the police officers could have approached Mr. Davis and said, hey, we're waiting for someone to pick you up, that's one thing. But that is not what happened here. You're saying they couldn't have, under that hypothetical, they couldn't have approached him and said, what's that strange bulge in your pocket? Well, at the point they pulled up, Your Honor, they didn't... At what point are his Fourth Amendment rights violated? Mr. Davis's Fourth Amendment rights are violated at the point that the police officers pull up close enough to him to grab him according to their own testimony and tell him to take his hands off his pocket. If you're wrong about that and if they're not... And if he was... Well, never mind. I forget that question. I'm getting lost in it. I understand. It's the same question, because my point was, assuming that we determine that it's not the closeness of the vehicle that constitutes a seizure, but the seizure doesn't occur until after they grab him, then how does that affect your argument in position? Assuming that, for a moment, Your Honor, the answer is this. There is a second prong of Terry that requires us to evaluate the reasonableness of the detention, and here the officers never engaged in a Terry stop. I mean, this transitioned from the officers... Assuming, as Judge Dunlap just suggested, that the point of seizure is not when the car pulls up, this transitioned from the officers pulling up to him to an arrest. According to the officers' own testimony, as soon as they see this bulge, be it gun-shaped or just a bulge, they jump out of the car, they pin his arms up, and they stick their hand into his pocket. They don't engage in a frisk or a pat-down or an investigatory pat-down to check for offensive weapons, as is permitted by Terry. They arrest him, and I would argue, Your Honor, that they did not have probable cause to arrest him at that point. And so, no, I think perhaps it affects the legal analysis if the court finds that the point of seizure... But for legal analysis, it's not dependent. Your Fourth Amendment violation claim is hardly dependent on a finding that seizure occurred at the moment at which you think it occurred. No, Your Honor. I would argue that, yes, the court could find that the point of seizure did not occur until his hands were held and still the... What do you make, briefly, of the case that your opposing counsel referred to and the Michigan statute she referred to, neither of which are mentioned in the government's brief? Your Honor, I'm very sorry. I'm not familiar with that case. I would just argue, from a common-sense perspective, it does not seem just to assume that the police can... Assume that someone is not legally carrying a firearm just because they're not walking around with their permit taped to their shirt. But, counsel, once the police find somebody late at night in a high-crime area and determine that they do have a gun... Let's just make... I'm giving you a hypothetical now. Yes, Your Honor. Determine that they do have a gun, it certainly doesn't strike me as reasonable that they have to figure out then whether there's a permit or not. I mean, somebody could get shot while they're in the patrol car trying to bring up records to see whether that person, whose name they don't even know, has a permit to carry a gun. The presumption, it seems to me, has to be on the person carrying the gun to show that it's being carried validly. Your Honor, I think, and I see my time is up, if I may just respond to you, Judge Chaudry. I think the difference here is that they don't know that he has a gun. Oh, I'm not giving you that. I'm giving you a hypothetical where they know he has a gun. That certainly, in that case, they wouldn't have to wait to do something about it until they can establish whether he's got a permit or not. I would agree that at the point they have determined someone has a gun, that they can seize the firearm and determine whether, for safety purposes. Yes. Okay. Thank you. Okay. Thank you. Thank you, Your Honors. If there are no further questions. Ms. Hayes. Can I respond to just a few facts and then talk about point of seizure? Mr. Davis has not been able to point to any credibility determinations in the record. Well, wait just a minute. Just a minute. Here is what is bothering me. Really, the whole thing apparently started because one of the policemen thought he looked nervous and was in a high crime area late at night. The other two officers didn't see any kind of behavior that would have made them think that they should pull up to him and do investigation. We are here dependent on one officer's testimony that he looked nervous or scared, and then we have the judge saying that she found the officer's testimony unconvincing. I don't know to what extent we're going to decide we are bound by that credibility determination, but it seems to me it's a big obstacle to your trying to get this case reversed. I have two responses, Your Honor. The first is that the testimony was not that they pulled into the gas station to check on Mr. Davis. The testimony was that they were returning to the scene of a shooting, and they wanted to stop for some water at that gas station. As they were turning in, they had already made the decision to turn into the gas station, they see Mr. Davis standing against the gas station. That's when he makes eye contact with the driver, he looks nervous and scared, then he moves. He turns and walks away. That's when they continue to come into the gas station, which they were already going to do, and in fact, Officer Elam's testimony was that, no, of course a nervous look alone is not enough for me to go and stop a guy. He said it's all the stuff that came after that led to the stop. And I think we would want police officers to, if they notice something, it's okay for them to keep an eye and see if things develop or if the guy isn't doing anything else suspicious. I think that is permissible and certainly doesn't implicate his Fourth Amendment rights. And my second response is that I do not see, and I've read that order over and over and over again, and I understand that the language sounds like a credibility finding, but it's really not, because what she says is she's not convinced that these factors should be considered in a reasonable suspicion analysis. She never makes a determination that they're not credible or that they shouldn't be believed. In fact, even where she says that she's not convinced that the defendant looked nervous or walked away, it's possible that's a clear factual error because, you see, Mr. Davis admitted that he was nervous. He said he was nervous because he had been robbed there. This is at page ID 345 and 355. And also defense counsel conceded, yes, my client was nervous, here's why, though. And that was at page ID 157 and 158. I don't think that the district court's actually making a factual error there. I think what the district court means is that it's not convinced that those two factors, the nervous and scared look and the walk away, should be considered because of Mr. Davis' innocent explanations. But that's a legal error. It reads, the court is not convinced that defendant looked nervous or walked away from the officers. I mean, there it is on the page. And then she does say the court is not convinced that there's sufficient evidence to make the fact that it may have been a high crime area particularly relevant either. But, I mean, if she doesn't believe that he looked nervous or tried to walk away, she's undercut the whole basis for them having any sort of encounter with him at all. I disagree because of all the other factors that they observed including that weight and the swing. Wait a minute, you're just, I mean, if we're arguing here about the weight of the evidence, that's going to be problematic for you because the district court gets to make the fact findings and unless they're clearly erroneous, we don't have any basis for disturbing them. I agree and that's the problem with the, if the district court is making a factual finding that he didn't look nervous, the problem is that you do have a basis to find that that's clear error because there's nothing, nothing in the record to support that he didn't look nervous. Wait a minute, I thought two officers didn't notice that he looked, anything about him that was unusual. The two officers. Isn't that right? It's correct that they weren't able to affirmatively say that he looked nervous. Well, I mean, if one officer says he looks nervous and two officers notice nothing unusual about his demeanor, then it seems to me that you've got a basis to say the officer who claims he was nervous is not particularly credible on that point. And I want to get back to the facts, Your Honor, because I don't think the facts bear that out because what the officer testified, Officer Alam, the initial officer, testified was that when he made eye contact, he looked nervous and scared and then he made the movements. The other two officers didn't have that eye contact with the defendant and they testified that they saw him look up towards their car and turn. But when you have a whole array of facts that are different in large degree or small, the district court, the fact finder there, gets to find those facts. And you seem to be arguing because she didn't say, I find based on the evidence that it might not have been a factual finding, but no matter how you read that, she's making a factual finding because she wasn't there as a witness. So she's making a finding based on the evidence presented before her. And that finding is set forth in the record. It may not have any magic words or labels, but there it is. It's a factual finding. I agree that there needn't be magic words or labels. I'm actually trying to be more generous in my reading of that sentence because it is not supported even by Davis' own testimony. He said he was nervous because he had been robbed. His defense counsel conceded that he was nervous. A person being nervous and appearing nervous are not necessarily the same. Just because somebody might be nervous, they may not appear nervous to somebody else. If I've never seen you before, I don't know whether you're nervous now or not. You might be nervous. You don't look nervous. I think that's to be discounted there. The judge made a factual finding and I think that's what we're stuck with. Ms. Hayes, if I can interrupt just one more minute. I do see now, looking at this, what you were trying to tell me. The judge says the officer's testimony taken as a whole was unconvincing. Then the next sentence is they had no reasonable suspicion to stop Davis. I see. What you're telling me is that she was just looking at the totality of what they said, rather than making a credibility determination. Yes, that's what I was inartfully trying to explain. What was unconvincing to her, I believe, based on her order, was the totality of the circumstances weren't there for her. Our claim is that that's because of a legal error, because they were taken in isolation. I see that my time has well expired, so thank you. We'll consider the case carefully. Thank you both for your argument. I believe that's the last case to be argued, and you may adjourn court.